## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DIANA LEWIS,**

               Plaintiff,

vs.                                   Civ. No. 06-434 WJ/ACT

**D. R. HORTON, INC.,**

               Defendant.

## <u>MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>

**THIS MATTER** comes before the Court on Defendant D. R. Horton Inc.'s ("Horton") Motion for Summary Judgment No. 1: Motion for Summary Judgment on Liability with Respect to all Claims filed December 14, 2007 [Doc. 103]. An Order of Reference referring this matter to the undersigned was filed on May 21, 2008 [Doc. 141].[1] The Court has reviewed Defendant's motion and memorandum brief [Doc. 103], Plaintiff's response [Doc. 115] and Defendant's reply [Doc. 130] and determined that it is not necessary to conduct a hearing.

---

[1] Pursuant to 28 U.S.C § 636(b)(1)(C) within ten (10) days after a party is served with a copy of these proposed findings and recommended disposition that party may file objections to such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas, N.W Albuquerque, NM,87102. A party must file any objections within the ten (10) day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.

1

**Summary judgment standard.**

1.      Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (citation omitted).  Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." *Id*. at 1164.

2.      The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." *Id*. at 249-50. Mere assertions and conjecture, nor the existence of a scintilla of evidence in support of the nonmovant's position, are sufficient to show a genuine issue of material fact; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and quotations omitted).

3.      For the purposes of summary judgment, the Court will assume the evidence of the non-moving party to be true, will resolve all doubts against the moving party, construe all evidence in the light most favorable to the non-moving party, and draw all inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 255.

**Undisputed facts material to liability.[2]**

*Horton*

4.      Horton is in the residential home construction business.  Horton has numerous divisions in the United States, each with its own president and management staff.    The Albuquerque/New Mexico division is one of 44 divisions.[3]  In 1998 the Albuquerque/New Mexico division had 20 employees.  At the time Lewis resigned, the division had 122 employees.  In 1999, Horton's Albuquerque/New Mexico division sold 267 homes; in 2005 it sold 1,339 homes; and in 2006, it sold 1,515 homes.

5.      In 2002, Congress enacted the Sarbanes-Oxley legislation, after the Enron scandal.  Sarbanes-Oxley requires, among other things, complex analysis of publicly traded companies and their financial records, necessitating internal audits and scrutiny of Horton, particularly of Horton's largest investments, land and lot development.  Corporate officers were required to ensure that certain internal financial controls were in place and execute certificates acknowledging their review of and truthfulness of financial statements and reports.  Sarbanes-Oxley imposes penalties or fines and/or up to 20 years imprisonment for certain violations of the Act.

6.      Due to the level of investment and rapidly changing conditions, there was an ever increasing need for accurate financial information, ranging from accurately tracking existing

---

[2]Local Rule 56 states in part that "material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted."  D.N.M.LR-Civ. 56(b).  Lewis argues that many of Horton's facts are disputed and immaterial.  In most instances, however, instead of specifically controverting the facts, Lewis merely argues her case by interspersing her factual contentions.  In its analysis, the Court has relied on facts that are undisputed and has construed the facts relied on most favorable to Lewis.   Immaterial facts are omitted.

[3]The Court notes that Horton appears to use the terms "New Mexico division" and "Albuquerque division" interchangeably.

investments, to creating competent and extensive financial models for analyzing potential future risks, gains and returns on investments, to projecting how the community will react dependent on the number of houses being released into the market.

7.      Tom Davis, regional president of Horton at the time, was encouraging each of the divisions to make sure they were properly staffed to meet these new and expanding requirements and insisted that a strong leader, backed by a strong second in command, be in each division accounting department.

8.      Horton's corporate CEO was insisting that each division upgrade teams in anticipation of growth. Mark Ferguson ("Ferguson"), President of the New Mexico division, added two positions, a CFO and Senior VP of land, positions the New Mexico division of Horton had not filled prior to that time.[4]  Both positions were filled in anticipation of future growth and to shore up deficiencies in existing accounting and land staff, the two departments that are closely involved in Horton's largest investment area, land and lots.

9.      In October of 2004, Bill Wheat, CFO for corporate Horton, gave a presentation which included the following illustration:

o      Three Years Ago:

---

[4]Lewis attempts to refute this statement.  Lewis states that Dean Anderson ("Anderson"), CFO of New Mexico division, stated in his deposition that her duties "weren't her job duties.  They were my job duties, when I started as the CFO for the division."  In the very next sentence, Anderson states "what happened is, the job duties were split out at that point in time when it was decided to have a No.1 and a No.2."  Lewis further states that Robert Prewitt,VP of Land & Development resigned soon after a Senior VP of Land was hired and his position was not filled.  Lewis further states that Ferguson did not demote Prewitt, remove his VP title, or make any changes to his bonus entitlement.  The Court has reviewed the cited pages and they do not reveal the facts stated by Lewis.  The court notes that "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without...depending on the trial court to conduct its own search of the record."  *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004).  Moreover, the material fact is that the CFO position was newly created; a fact that Lewis has not specifically controverted.

- ^ 40% of Divisions had controllers
- ^ Region CFO's assigned to 20% of Divisions
- o Today:
  - ^ 90% of Divisions have controllers/CFO's or both
  - ^ Region CFO's assigned to 70% of Divisions
- o FYE 2004 Goal:
  - ^ 100% of Divisions with controllers/CFO's or both
  - ^ 100% Region CFO coverage
- o March 2005 Goal:
  - **^** **Top 20 Divisions** need to have a **strong #2 accounting professional** in place.  Region CFO should be involved in the hiring or promotion decision.

10.     Chris Frandsen, ("Frandsen") regional CFO who oversaw certain divisions including the New Mexico division, considered the division CFO and division controller as two different positions and that divisions, such as New Mexico, had reached a certain level of sales requiring strong persons in both positions.  He testified that:

> ....the controller is responsible for the accounting team and the personnel, the day to day activities and the things that they may do are often task oriented reports.  Monthly issues to handle with close or review of budgets and things of that nature.
>
> Whereas, the division CFO role is primarily strategic being a business partner to the division president and handling forecasting and issues that are less concrete that what the controller may handle.  It is more making estimates and assumptions and also trying to work within the division and bridging all the different departments to bring the data to the division president to help him make those [decisions].

Horton Exh. D, 70:1-15.

He further testified that:

> Typically the controller becomes the person who has the longer lists of tasks.  Whereas, oftentimes the division CFO spends their time identifying needs within the division or helping to resolve those needs, once identified, or if the division president of the department is having issues with something that they are the person available to step in and strengthen the controls and fix the process, whether it be operational or financial [in] nature.

*Id.* at 70:21-25, 71:1-4.

5

11.     Frandsen also testified that the added complexities of Sarbanes-Oxley accounting and reporting requirements imposed a new requirement to "document all their processes." *Id*. at 94:1-3.

*Lewis*

12.     Lewis has a bachelors degree in accountancy from New Mexico State University in 1980.  Prior to her employment with Horton, Lewis had spent approximately four years in the home building industry.  Ferguson hired Lewis in 1999 as an accounting manager and Lewis worked at Horton until May of 2005. During her employment at Horton, Lewis had various titles, including Controller, VP/Controller, and Vice-President of Financial Operations/Division Controller.  She referred to herself as "Vice President of Controller."  Lewis testified that her duties did not change when Vice President was included in her title.

13.     Part of Lewis' work included preparation of three reports:  Five-Year Budget projections, Land Acquisition Funding Summary (LAFS) and Tract Pie, which was used to measure the cost of buildings, land and projected profit.[5]  Lewis prepared the Five-Year budgets during her employment with Horton. Lewis  was responsible for preparing the LAFS report from December 2004 until April 26, 2005.  Lewis starting preparing the Tract Pie in 2001.

14.     In 2004, Lewis hired an accounts payable manager and an assistant controller named Tamara Jensen ("Jensen").  Ferguson was not 100% behind Lewis' decision to hire an assistant controller.  Also in 2004, there were corporate and regional mandated software conversions:  e.g. to JD Edwards, also referred to as JDE.

---

[5]Horton stated approximately fifteen undisputed facts concerning how these reports were prepared.  Lewis argued that these facts were disputed. For purposes of this Motion and construing the facts most favorably to Lewis, the Court assumes that Lewis "prepared" the three reports.

15.     In her deposition, Lewis referred to a budget she prepared as a "SWAG" which she translated as "scientific wild-ass guess."  Horton Exh. C at 79:15-21.

*Lewis' performance.*

16.     The only formal written performance evaluation for Lewis was in 2003.  She received an overall rating of 96 which put her in the outstanding range.  Under areas of needed improvement Ferguson wrote "[m]ore focus on quality/information/reports to supervisor.  Diana must not only account for current and historic trends but continually seek new ways to model future trends and projections and 'what ifs' for supervisor."  Horton Exh. E.

17.     On August 19, 2004, William C. Brewer, Corporate Accounting Manager wrote an e-mail to Frandsen stating:

> She (Lewis) is very much into the operational side of the division, and less enamored with all aspects of general accounting.  She's competent at accounting, just not in love with the dr's and cr's to the exclusion of operational considerations.  That's actually very good...Obviously, you can see I think Diana is a keeper.  We just need to encourage and enable her....to build a stronger department underneath her.  Can she take the division dynamically to 2000 units annually?  I think it depends on how dynamic we get here.  With a more orderly growth pattern, and competent help, no problem.  If we double in two years, I'd have to see more to make a final evaluation.  I'd lean toward OK if she has much stronger help.

Lewis Exh. 17.

18.     On October 25, 2004, Ferguson wrote an e-mail to Bob Prewitt, with a copy to Lewis stating in part:

> Even though Diana failed to get the LAFS out last week, I still want these reports sent from the Accounting Department on a going forward basis.  On another note, I want a meeting with you and Diana to discuss the problem we had with the LAFS and with the Sungate lot price standard.  I have seen A GPA with an appx $28K cost, but I have also seen land reports (land and Dev cost) reflecting a $24K cost.  I want to determine why it exits and make changes as necessary to fix.  Further, it appears we are late on Tract Pie analysis and copies to Davis to enable which will postpone finding until next week-provided of course we

Forward the Tract Pies this week....We continue to struggle with the LAFS and time frames for documentation that Region needs in order to assist us.

Horton Exh. C, Exh. 5.13

19.    On January 24, 2005, Ferguson wrote the following e-mail to Lewis:

1)    Update our Weekly Funding Request Report as follows.
2)    Be sure to compare the Weekly Funding Report to the LAFS.  They must reconcile. Most recent problem was an appx $94K Earnest money amount that was on the LAFS  for funding, but was not on the Weekly Funding Report.  All this does is require that Region call me to find out if we need the money or not.  Let me restate this again-As the Controller, I expect you check these reports for accuracy before sending THEM off to Region.  Every week it seems that our LAFS and Weekly Funding do not match-either by subdivision name differences or most often, funding requests dates on the LAFS and WFRR do not match.  As Controller, I hold you accountable for ensuring the accuracy of these reports.  You would be benefitted to review them a little more carefully.

Horton Exh. C, Exh. 5.31.

Lewis responded as follows:

I was told by the land department that there were no fundings for this week so I did not check the LAFS for fundings for this week.

*Id.*

Ferguson then wrote the following e-mail to Lewis:

You may not believe you have any changes, but that is not accurate.  Future funding events continually move toward the present.  Once they get within close range, Region starts to compare LAF data with WFRR data.  If it doesn't match, I get a calls as to why.  All the while, I was expecting you. my Controller, to be reviewing the changing landscape of dates, dollars and events coming up.  Therefore, let me state once again, "I do care what you may hear from the Land Department, but I am equally interested in what you "see" on the reports and if it is accurate.  We have discussed this before and it appears we are destined to discuss it yet again.  This is exactly whey  we have discussed my concerns regarding your service as my Controller.  You do not follow what I instruct you to do.  I requests financials, they are not provided. I say "Get all the parties to initial the Tract Pies for accuracy" you do not and oversights are made.  I say "I want you to review that LAFS and WFRR for accuracy before they go to Region and you admit that you did not check the   LAFS.  This a bad trend.

*Id.*

8

Lewis responded to this e-mail stating:

> First of all I apologize I missed a date on the LAFS.  I sent if off to region at 8:00 on Thursday night and was tired and missed a date.  Second, the reason the $ for the land purchase on Vista de la Montana was wrong was because Bob and I had been doing what-ifs with Vista and that was the last number I had.  I had requested a return sign off but he did not do it and I was gone to Charlestown.  Next time I will not send anything off if I am not in        the office to review paperwork.  I gave you financials from JDE this month, they were not in the format I want to get to.  I am completely overloaded and have beensince the conversion from JDE.  My biggest fear is that I am going to miss something and get fired but I never dreamed that missing a date on LAFS which was not even critical would be the mistake.  I always review the dollars to make sure nothing changes and I make sure that if there are any new projects on it that they are on the 5 year as well.

*Id.*

### *Hiring of CFO*

20.      On August 18, 2004, Frandsen wrote a memo to Ferguson and others with a copy to Lewis and others entitled "Region CFO Involvement-Hiring and Termination of Key Accounting Personnel."

21.      On November 11, 2004, Chris Sanchez, Recruiting Manager for Robert Half Finance & Accounting wrote an e-mail to Frandsen concerning CFO candidates.  Ferguson interviewed three male candidates.  Anderson was one of the candidates.  Anderson's resume indicates he had over 20 years experience in the home building industry and was CFO for two home building companies.

22.      In her deposition Lewis testified that she knew there was a move in Horton to have CFO's as well as controllers, and that New Mexico was not an isolated incident and she never expected to have the title of CFO.  Horton Exh. C, 373:6-14, 382: 4-11.

23.      Ferguson hired Anderson for the position of CFO.  Chris Frandsen announced his employment in a March 31, 2005, e-mail which stated in part:

> "With recent additions of Dean and Tamara, plus Diana's continued experience and dedication, New Mexico's financial team is poised to help the division reach the 'next level'."

Lewis Exh. 5.

24.     Anderson assumed the responsibility for the Five-Year Budgets, LAFS and Track Pies. Preparation of these reports took approximately 15 to 20 percent of his time. The IT department which was formerly under Lewis was put under Anderson. In an e-mail dated April 1, 2005, Anderson wrote Frandsen that:

> "Diana will be responsible for accurate and timely accounting reporting, supervision of her staff, and assisting me in my transition of taking over the above mentioned tasks . She will also assist me in helping in the conversion to Builder 1440 and Air Tools to make sure the controls we require for corporate, region and Sarbanes/Oxley are in place."

Lewis Exh. 6.

25.     On April 1, 2005, Lewis wrote to a controller in another Horton division the following e-mail:

> We decided we needed a CFO and I didn't want the job.  I am tired of being the lone ranger and was ready to be Tonto for a while.  Dean Anderson started about two or three weeks ago and I am hoping very shortly I can turn the 5 year and Tract Pie over to him and he can deal with the 5,000 daily Chris e-mails--maybe I will only get 2500.  I am planning on no more than 10 hour days down from thirteen or fourteen and as soon as Dean can take on the 5 year I am going to plan a two week vacation.  Just getting old I guess.

Horton Exh. C, Exhibit 17.

Lewis stated in her affidavit that she said what she said in this e-mail to "save face."  Lewis Exh. 1 at  ¶ 13.

26.     After Anderson was employed and had taken over his CFO responsibilities including the Five-Year Budget projects, the LAFS and the Tract Pies, Lewis was doing everything that she would normally do.  Her position was much broader than the three reports Anderson took over.  She

continued "to supervise Tamara" and had "some oversight over accounts payable." Horton Exh. C, 284:1-6.. She also continued doing financial reports using the JD Edwards system which included checking for variances with land department budgets and reports on productivity, and number of invoices entered. She was also doing clean up work on the JD Edwards conversion process, particularly on the inventory accounts. *Id.* at 17-25, 285:1-9.

27.    As CFO, Anderson assisted Ferguson with the total operations of the business including construction, marketing, cost, and infrastructure as well as long-term financial planning. The controller manages the accounting department and prepares financial reports showing the current financial status of the division.

*Lewis' resignation*

28.    On April 25, 2005, Lewis received a bonus check for $1,000.00. On April 26, 2006, Lewis met with Ferguson and Anderson. Lewis was offered a reassignment to the land department.

29.    On April 27 and 28, 2005, Lewis called in sick.

30.    On April 27, 2005, Ferguson wrote an e-mail to Lewis stating:[6]

Given that you do not want to work for Rick Bressan in the Land Department as was discussed as an option, I will consider that matter closed and off the table. I believe that Rick already has a candidate interested in the position who wants to be there. I recognize that it is your preference not eliminate the Controller position. However, I am having a hard time justifying the need for a CFO, Controller, Assistant Controller, and an Accounts Payable Manager., all overseeing very few staff workers. In reviewing the whole situation again today, I went through many of the e-mails and issues that we have discussed over that past months. I have made some simple notes at the top of each E-mail. We can discuss these when you return to work. This reminded me once again why I needed to hire a CFO and achieve better reporting, financial guidance, and department management.

---

[6]In her response, Lewis disputes the facts in this e-mail by arguing that she was going to be reassigned to the land department and was threatened with being a fall person if the land department failed the audit. The facts are that she resigned before any reassignment;prior to resigning Ferguson took the matter "off the table;" and Rick Bressan in the Land Department had a interested candidate prior to Lewis' resignation.

....When you wanted to hire Carmen as an AP Manager, I questioned why the AP management could not be handled by the Tamera, Assistant Controller, out of my expressed concern that you were building too much staff below you while knowing that I intended to place a CFO above you. But, because of your persistence for more staff....I allowed you to add Carmen as AP Manager.

Soon after, I did hire Dean as CFO, in efforts to bring better Account Department leadership and guidance to the division. This also came from the encouragement from my own managers at Region and Corporate who dealt with the challenges resulting from our inadequate division accounting performance....

Many of the problems were simple cross checks that a Controller should routinely do....

Lewis Exh. 9.

In another e-mail on that same day, Ferguson tells Diana as he has discussed with her previously, that as a result of the hiring of a CFO and her position changing from VP/Controller to Controller she would no longer be entitled to a written bonus plan. Lewis Exh. 7.

31.    On April 28, 2005, Lewis wrote a letter of resignation to Anderson and copied Ferguson. The letter stated:

This is to tender my notice of resignation as controller of the Albuquerque Division of D.R. Horton effective May 13, 2005, two weeks from today's date. I find I have no other choice since my job has been threatened if I do not accept a much lower position as some sort of a budget person in the land department. I also was notified on Tuesday, April 26, 2005, that I am no longer participating in the bonus program. Since I can only construe this to mean that I no longer retain my position as controller, I do hereby tender my resignation.

Lewis Exh. 10.

32.    On April 29, 2005, Ferguson sends an e-mail to Mark Dyal, Horton's Corporate Account Manager, that he does not intend to replace the Controller position at this time and that "we are appropriately staffed at this time." Lewis Exh.11.

12

*Salaries and bonus plans*

33.     In the summer of 2003, Lewis told Ferguson that her salary was not commensurate with her duties and responsibilities as well as pay surveys from individuals performing the same job functions.  Ferguson raised her salary to $51,000.  In 2004, Lewis base salary was $56,000 and her bonus was $65,465.16.

34.     During the time that Lewis was employed at Horton, Horton had two types of bonus plans.  One was the general bonus pool and the other was the written bonus plan.  The written bonus plan for 2004 states that "[t]his Bonus Plan is for fiscal 2004 only and is subject to change from year to year."  Horton Exh. K.  The written bonus plan for fiscal year 2004 was based on division performance.

35.     Lewis was on the written bonus plan for the last quarter of fiscal year 2001, 2002, 2003, and 2004.  Lewis was given a bonus under the terms of the written bonus plan for the first quarter of fiscal year 2005 (October through December) but not for the second quarter of fiscal year, which ended at the end of March 2005.  It is typed on her bonus sheet for 2005 "[B]onus for 1st Qtr 05 only.  Does not apply to any following quarter due to PR2 Status change in status from VP/Controller to Controller." Lewis Exh. 12.

36.     Jensen's starting salary as assistant controller in 2004 was $50,000.  In approximately November of 2005, she was promoted to controller and her salary increased to $60,000.  She has been on the written bonus plan since approximately November of 2006.

37.     Anderson's last employer prior to Horton was Longford Homes.  He was paid $123,000 plus bonus. Horton paid Anderson $120,000 per year plus bonus.  In 2006, Anderson's total compensation was $253,883.

38.     In the Albuquerque/New Mexico division, the male vice-presidents' base compensation ranged between $75,000 to $145,000 and the female vice-president's base compensation ranged between $56,000 to $65,000.

**Discussion.**

*Title VII claims.*

39.     Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin.  42 U.S.C. §§ 2000e-2000e-17.  A plaintiff asserting a cause of action under Title VII may demonstrate intentional discrimination through either direct or indirect evidence.  *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005).  In this matter there is no direct evidence of discrimination.  *EEOC v. Wendy's of Colorado Springs, Inc*., 727 F. Supp. 1375, 1380 (D. Colo. 1989) (An obvious example of direct evidence is a statement by a supervisory that the employer "doesn't promote women.")

40.     In the absence of direct evidence, claims of discrimination are subject to the Supreme Court's burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804 (1973).  *EEOC v. Horizon /CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000).  In this analysis, Plaintiff must first establish a *prima facie* case of discrimination in order to survive summary judgment.  *McDonnell Douglas Corp.*, 411 U.S. at 802  The Court notes that the parties did not provide the Court with the *prima facie* standard to be applied in this case.  The parties failed to provide any framework to the Court as to how to proceed.  When the parties attempted to argue the elements of a *prima facie* case, they did not rely on cases involving Title VII gender discrimination.  For instance Lewis asserts that the *prima facie* case for pay discrimination and discriminatory demotion are different and Lewis relies on an ADEA case involving a reduction in

14

force for the elements of discriminatory demotion, *Branson v. Price River Coal Co*., 853 F.2d 768, 770 (10th Cir.1988).  Horton asserts that a claim of constructive discharge arises solely from a claim of sexual harassment. In its reply, Horton argues that because Lewis cannot prevail on a hostile environment claim, summary judgment must be granted on the issue of constructive discharge. Horton's analysis is incorrect.   Constructive discharge is analyzed using the elements of discriminatory discharge.  *Baca v. Sklar*, 398 F.3d 1210 (10th Cir. 2005). In addition, Horton relied on a reverse discrimination case, *Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1533 (10th Cir. 1995), when stating the elements of a constructive discharge cause of action.

41.     It is true that, to some extent, the elements under *McDonnell Douglas* are flexible. *McDonnell Douglas*,  411 U.S. at 802, n. 13.  The central question of the *prima facie* case is whether a plaintiff can show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the act.'"  *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576 (1978) (citation omitted).  However, the parties simply did not provide any framework with which to analyze the facts of this matter.  The Court finds that it is appropriate to analyze this case as one of disparate treatment and discriminatory discharge.  The Court notes that even if different *prima facie* elements are analyzed, ultimately Lewis cannot prevail because she has failed to demonstrate that Horton's reasons for the change in her circumstances were a pretext for intentional gender discrimination.

1.     Disparate treatment.

a.     Legal standard.

42.     In a disparate treatment case, plaintiff bears the initial burden to establish a *prima facie* case of discrimination.  *Carter v. Mineta*, 125 Fed. Appx. 231, 235 (10th Cir. 2005).  A plaintiff meets this burden by showing that:  (i) she is a member of a protected class; (ii) she suffered an adverse employment action; and (iii) similarly situated employees were treated differently.  *Trujillo v. Univ. of Colo Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  The plaintiff's burden at the *prima facie* stage of the *McDonnell Douglas* analysis is "not onerous."  *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 2563 (1981).  In articulating a *prima facie* case, "a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant."  *Orr v. City of Albuquerque*, 417 F.3d at 1149 (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d at 1193).

43.     Once a plaintiff establishes a *prima facie* case of discrimination, the burden of proof shifts to the employer to articulate a legitimate, non-discriminatory reason for the alleged employment action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802.  The defendant is not obligated to litigate the merits of its reasoning nor does it need to prove that the reasons it relied upon were bona fide.  *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992).  The United States Court of Appeals for the Tenth Circuit has noted that "[t]he defendant's burden at this stage is one of production, not one of persuasion."  *EEOC v. Horizon/CMS Healthcare Cor*p, 220 F.3d at 1191 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 254-56.)  If the defendant is successful in articulating some legitimate, non-discriminatory reason, "the presumption of discrimination established by the *prima facie* showing 'simply drops out of the picture.'"  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114,1125 (10th Cir. 2005) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 511(1993)).

16

44.     If the defendant is able to articulate a non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext.  *Argo v. Blue Cross & Blue Shield of Kan., I*nc., 452 F.3d 1193, 1203 (10th Cir. 2006). To establish pretext, a plaintiff must present evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir. 1997)).  A facially nondiscriminatory reason is a pretext when it is a cover-up for a decision motivated by unlawful discrimination.  *EEOC v. Flasher Co*., 986 F.2d at 1316.  Examples of pretextual evidence include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating...criteria); and the use of subjective criteria." *Merritt v. Tellabs Operations, Inc.*, 222 Fed. Appx. 679, 682 (10th Cir. 2007). The plaintiff is not required to present evidence of actual discrimination to establish pretext, because "[e]vidence tending to show pretext permits an inference that the employer acted for discriminatory reasons." *Bryant v. Farmers Ins. Exch.*, 432 F.3d at 1125.

b.      Discussion.

45.     Lewis as a female is a member of a protected class. As to the second element, Lewis alleges two adverse employment actions: decrease in pay and demotion.[7]

_____

[7]There is support in the case law that to establish a *prima facie* case of discriminatory demotion, Plaintiff must show: (1) that she was within a protected group; (2) adversely affected by the defendant's employment decision; (3) qualified for the position at issue; and (4) that the job from which she was demoted was not eliminated. *Jones v. Denver Post Corp.*, 203 F.3d 748,753 (10th Cir. 2000).  The Court's analysis of Lewis' claim of constructive discharge would then apply.  In that analysis the Court assumes that Lewis met her *prima facie* case but did not demonstrate that Horton's

46.     An adverse employment action under Title VII is discriminatory conduct that "alters the employee's compensation terms, conditions, or privileges of employment, or adversely affects his or her status as an employee." *Heno v. Sprint/United Mgmt. Co*., 208 F.3d 847, 857 (10th Cir. 2000). "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to a level of an adverse employment action." *Haynes v. Level 3 Commc'ns., LLC*, 456 F.3d 1215, 1222  (10th Cir. 2006).  The plaintiff's subjective views on the situation are irrelevant. *Id.*

47.     For purposes of this opinion only, the Court will assume that Lewis suffered an adverse employment action.[8]

48.     Lewis argues she was replaced by Anderson and Anderson earned substantially more than she did for performing the same work.  Lewis alleges she was treated differently than Anderson because Anderson was paid more than Lewis.  The burden is on the plaintiff to show that she is similarly situated to the employee with whom she is comparing herself.  *Velasquez v. Frontier Medical, Inc*., 375 F. Supp. 2d 1253, 1283 (D.N.M. 2005) (citation omitted).

49.     Lewis and Anderson are not similarly situated employees because they held two different positions.  Lewis and Anderson had different job duties and responsibilities.  Anderson's

---

reasons were pretextual.

[8]Horton relies on three cases for the proposition that failure to receive discretionary bonuses are not adverse employment actions, *Rabinovitz*, 89 F.3d 482, 488-489 (7th Cir. 1996); *Tovar v. T-Mobile USA*, 2006 U.S. Dist. LEXIS 96042 (D.N.M. 2006), and *Bozeman v. Per Se Technologies, Inc.*,456 F. Supp. 2d 1282 (N.D. Ga. 2006)  These cases are Title VII retaliation cases. In Title VII retaliation cases, unlike discrimination cases, the adverse employment action must be material.

position was CFO, a newly created position.  Lewis' position was as controller, a position  that

Lewis stated she held since May of 2001.

        50.    Frandsen testified that the:

> ....controller is responsible for the accounting team and the personnel, the day to day activities and the things that they may do are often task-oriented reports. Monthly issues to handle with close or review of budgets and things of that nature.

> Whereas, the division CFO role is primarily strategic being a business partner to the division president and handling forecasting and issues that are less concrete than what the controller may handle.  It is more making estimates and assumptions and also trying to work within the division and bridging all the different departments to bring the data to the division president to help him make those [decisions].

Horton Exh. D, 70:1-15.

Frandsen also testified that:

> Typically the controller becomes the person who has the longer lists of tasks.  Whereas, oftentimes the division CFO spends their time identifying needs within the division or helping to resolve those needs, once identified, or if the division president of the department is having issues with something that they are the person available to step in and strengthen the controls and fix the process, whether it be operational or financial [in] nature.

*Id*. at 70:21-25, 71:104.

        51.    In Anderson's affidavit, he stated that as CFO he assisted Ferguson with the total

operations of the business including construction, marketing, cost infrastructure as well as long-term

financial planning.  He further stated that the controller manages the accounting department and

prepares financial reports showing the current financial status of the division.

        52.    To show they were similarly situated, Lewis relies on a statement by Anderson that

Lewis duties "weren't her job duties.  They were my job duties, when I started as the CFO for the

division." Lewis Exh. 25, 92:17-18.  The question to Anderson was whether he had assumed a lot

of her job responsibilities.  He replied as above and then states that "[w]hat happened is, the job

duties were split out at that point in time when it was decided to have a No.1 and No.2." *Id.* at 18-20. It is not totally clear as to the meaning of Anderson's response and no follow-up questions were asked. However, it is undisputed as to what occurred when Anderson was hired. Anderson took responsibility for the three reports previously done by Lewis; Anderson assumed the responsibilities and duties of the CFO and Lewis continued to be responsible for accounting functions. Lewis never held the title of CFO of the Albuquerque/New Mexico division of Horton. At most she performed some of the duties of a CFO. This is not sufficient to demonstrate similarly situated. *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363-4 (10th Cir. 1997).

53.    Lewis relies on Ferguson's deposition testimony asserting that Ferguson could not state, despite repeated questioning, the differences between Anderson's and Lewis' job functions and responsibilities. The Court has read the five pages of deposition testimony relied on by Lewis. The question to Ferguson was whether the job duties and activities listed in a job description for VP Accounting/Operations were performed by Lewis. Lewis Exh. 2. There was no additional questioning but rather a three page narrative response by Ferguson. In the deposition pages cited, Ferguson was not asked about the differences between Anderson and Lewis' job functions and responsibilities. The Court again notes that it is not its responsibility to find support for a party's position in the record. The Court has reviewed the entire record and the record does not support that Lewis was similarly situated to Anderson.

54.    Lewis also relies on Anderson's deposition testimony asserting that Anderson testified that he performed all of the duties listed in the job description for VP Accounting/Operations. That is not his testimony. Rather his testimony is as follows:

Q.    ....Let me ask you if your responsibilities included No. 1, there, under "Duties and Activities Performed"?

20

A.      No, because that's too nebulous of a sentence, there.  Ensure the department goals are met.  Department goals could be sales meeting, sales objectives.  I wasn't responsible for that.  What I would have on departments, would make sure that all financial aspects of reporting activities were correct.  So the sentence by itself is too general.

Lewis Exh. 25, 59: 8-19.

....

Q.      Would you have done No. 3?
A.      Yes, some of them, not every single purchase order, yes.

*Id*. at 60:15-17.

....

Q.      No. 10?
A.      I don't do that directly.  I make sure that it does happen, so that if this says, "Assure that all monthly accounting schedules are met," my answer would be, yes, but I'd have Tamara Jensen do that.  I'd just make sure that she's getting it all done.

*Id*. at 61: 6-11.

....

Q.      When you started?
A.      Once I had started at D.R. Horton, then I – after speaking with Diana, I realized some of the functions she had.  And one of those was, yes, supervising accounts payable.
Q.      And you do that supervision now?
A.      No, Tamara Jensen does that.

*Id*. at 73: 18-24.

....

Q.      Did your job duties from April 1st to April 29th, have they changed significantly?
A.      My job duties or my job responsibility?  My responsibility hasn't changed.  I've always been responsible everything within the division financially.

        As far as job duties, that would be, what tasks would I be performing?  Between April 1st and April 29th, I had Diana and Tamara doing a lot of those functions.

After Diana left, I can't remember exactly which duties we took, how I would separate it out.

At the point in time when Diana was still there, from the meeting on April 1st, when I was trying to feel my way through and see who was going to do what, until the point in time that she left, I know that on March 24th or 25th, whenever the five-year was due, Diana did that one. I know that in April, I did it.

I know that the closing of the books for March month-end, Diana probably did that, and she was in the process, then, of trying to train Tamara on that process. I know that after Diana left, then the April closing of the books, Tamara and I did together. And we also had Mark Dyal, the accounting manager, give us some help on that . And then, after that, it was Tamara's responsibility.

*Id*. at 83: 5-25, 84: 1-3.

55.   In addition, Lewis and Anderson are not similarly situated as to performance. There is no evidence in the record that Horton had any performance issues with Anderson. The undisputed evidence is that Horton did have performance issues with Lewis. E-mails from Ferguson to Lewis demonstrate that Ferguson held Lewis responsible for the inaccurate financial reports that were sent to the regional office and that Ferguson was not getting the financial information he was requesting from Lewis.

56.   Lewis also attempts to rely on the undisputed fact that in the Albuquerque/New Mexico division, male vice-president's base compensation ranged between $75,000 to $145,000 and the female vice-president's base compensation ranged between $56,000 to $65,000.  "[I]n order for statistical evidence to create an inference of discrimination,... [it] must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." *Fallis   v. Kerr-McKee Corp*., 944 F.2d 743, 746 (10th Cir. 1991) (emphasis omitted).  Lewis has failed to demonstrate that the vice presidents were performing

comparable work or that their qualifications and experience were similar. Thus, this data is meaningless.

57.     Even assuming Anderson and Lewis were similarly situated, Lewis cannot prevail. As discussed below, Horton has given legitimate non-discriminatory reasons for their decisions concerning Lewis, and Lewis has not offered any evidence demonstrating these reasons are pretextual.

      2.     <u>Discriminatory discharge.</u>

          a.     Legal Standard.

58.     To establish a *prima facie* case for discriminatory discharge plaintiff must show that (1) she belonged to a protected class; (2) she was qualified for the position; (3) she was discharged; and (4) the position was not eliminated after her discharge. *Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1150 (10th Cir. 2008); *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1229 (10th Cir. 2000).

          b.     Discussion.

59.     Lewis has established the first two elements. She is a female and she is qualified for the position of controller. As she voluntarily resigned, the issue is whether she was constructively discharged. A constructive discharge occurs when an employer, through its illegal discriminatory acts, makes working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 533 (10th Cir. 1998)*; Derr v. Gulf Oil Corp*., 796 F.2d 340, 344 (10th Cir. 1986). "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged. *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir. 1998). To

23

establish a claim of constructive discharge, the plaintiff must essentially show that she had no choice other than resignation. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) ("The bar is quite high in such cases: a plaintiff must show he had no choice but to quit."; *Yearous v. Niobara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997). In other words, the employment conditions must be objectively intolerable. *Sanchez v. Denver Pub. Sch.*, 164 F.3d at 533; *Ho Tran v. Trustees of the State Colleges in Colorado*, 355 F.3d 1263, 1270-71 (10th Cir. 2004) ("....a constructive discharge requires a showing that working conditions imposed by the employers are not only tangible or adverse, but intolerable.") In applying an objective standard the court disregards the employee's view of the workplace environment and the employer's subjective intentions. *Baca v. Sklar*, 398 F.3d at 1216.

60.     Lewis asserts she was constructively discharged when her pay was decreased and she was demoted. Specifically, Lewis asserts that when she was taken out of the written bonus pool and was asked to go to the Land Department she was constructively discharged. Lewis' title changed from VP/Controller to Controller. When she was taken out of the written bonus pool her salary decreased by over one-half. In addition, when Anderson was hired, her responsibilities diminished. The Court will assume for purposes of this opinion that Lewis was constructively discharged.[9]

61.     As to the fourth element, a plaintiff satisfies this by showing that the employer had a continued need for someone to perform the same work after the plaintiff left. *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999), *cert. denied*, 529 U.S. 110 (2000). Lewis was a division controller when she resigned. After she resigned her responsibilities were split between Anderson

---

[9]This is a close question and Lewis may not prevail because her position and duties and responsibilities were somewhat ill-defined at the time of her resignation. *Garrett v. Hewlett-Packard Co.*, 305 F.3d at 1221 ("This is especially so because Mr. Garrett resigned before he had complete details as to the position into which HP was in the process of transferring him.")

and Jensen. Seven months after Lewis resigned, Jensen was given the title of division controller. The Court will assume without deciding that Lewis has proven the fourth element.

62.     Horton has offered legitimate non-discriminatory reasons for changing Lewis' duties and responsibilities and decreasing her pay.  Horton states in its brief three reasons supported by the undisputed facts:  the New Mexico division was large enough to justify a controller and a CFO and a CFO was hired; the CFO position is a position different from the controller position; and Ferguson based Anderson's salary on negotiations, market conditions, what Anderson made previously, and Anderson's work history and skills. It is apparent from the undisputed facts that a CFO was hired because Horton had and was growing, the government had imposed more financial reporting requirements, and there were deficiencies in the existing staff.

63.     As Horton has met its second stage burden, Lewis, then, may resist summary judgment only by presenting evidence that Horton's reasons are pretextual; i.e. unworthy of belief. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and then infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti*, 108 F.3d 1319 (10th Cir 1997) (citing *Olson v. General Electric Astrospace*, 101 F.3d 947, 951-52 (3rd Cir. 1996)).  Mere conjecture that employer's explanation is pretext is insufficient to defeat summary judgment. *Richmond v. ONEOK, Inc*., 120 F.3d  208, 209 (10th Cir. 1997).  A plaintiff withstands a motion for summary judgment and is entitled to a trial if she presents evidence that the defendant's proffered reason is unworthy of belief. *Kendrick*, 220 F.3d at 1203.  "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly

believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999) (abrogated on other grounds).   When assessing a contention of pretext, the Court must examine the facts "as they appear to the person making the decision to [take the adverse action against the] plaintiff." *Kendrick*, 220 F.3d at 1231.

64.     Lewis argues that the following statements are true and thus Horton's reasons are a pretext:  Ferguson stated in a meeting he cannot justify having three managers in the accounting department; Ferguson wanted to assign Lewis to the land department; Ferguson did not replace Lewis; Anderson performed Lewis' duties; Ferguson paid Anderson what he wanted to pay Anderson; Anderson was not more qualified than Lewis; Lewis trained Anderson; and there is a discrepancy in pay between male and female department heads at Horton.  These facts do not demonstrate that Horton's reasons are unworthy of belief.  These facts do not demonstrate that Horton's reason are not make in good faith and believed by the individuals making them.

65.     Ferguson stated in a meeting and in an e-mail on April 27, 2005, that he could not justify having three managers in the accounting department at that time.  Lewis Exh. 9. The Court assumes that Lewis asserts that this statement makes Horton's statement that it was large enough to justify a controller and a CFO unworthy of belief.  However, the facts surrounding these two statements do not demonstrate Horton's proffered reason was pretextual.  It is undisputed that the trend in 2005 in all the Horton divisions was to have a CFO and "strong #2 accounting professional."  As a matter of fact, this is what occurred in November of 2005 with Anderson as CFO and Jensen as controller.  It is undisputed that Ferguson believed that Lewis was over-staffing her department by hiring an assistant controller.  It is also undisputed that Lewis had performance issues in late 2004 and early 2005.

66.     Lewis also relies on the fact that Ferguson wanted to re-assign Lewis to the land department.   As discussed previously, this never happened and that option was taken off the table prior to Lewis' resignation.  In addition, Ferguson testified in his deposition that the land budgets over which Lewis had control as controller need fixing up prior to an audit and he was giving her the opportunity to fix her problem.

67.     Anderson did not perform all of Lewis' duties.  As discussed herein, the undisputed facts demonstrate that the CFO and controller positions are different. There is no pretext about this statement.

68.     In Ferguson's Third Affidavit he states that Anderson's salary based on negotiations, market conditions, Mr. Anderson' previous pay, history and skills.  Lewis asserts that this statement is not true because Ferguson testified he was going to pay Anderson what he wanted to pay Anderson.  Ferguson's deposition testimony does not refute that Anderson salary was negotiated and based on market conditions, his previous pay, history and skills.

Q.     And did you discuss with him, when you had the meeting with him about what his pay requirements or requests were, what his range of salary he was looking at when you first met with him.  Do you remember that?

A.     I knew that the general range that Dean was at, I believe, was in the low 100s. In fact, he might have been like in the 130s or 140s where he was currently at, on his salary with some other bonus potential.

        That was well above what I had in mind, and I believe it was thirty days or more between the time we first met before an offer was ever extended, because he was out of the range of where I wanted to be on that position.

Q.     So that would have held up the meeting with Frandsen and Davis until there was further negotiations?

A.     I don't recall if it held it up or if I just didn't make a decision as promptly following the meeting.  So either it deferred their meeting or--either way, the decision to hire Mr. Anderson was deferred from a few weeks to over thirty days

27

because of that difference in requirements, what he expected and what I had in mind.

Lewis Exh. 24, 67:4-24.

69.     It is undisputed that there were negotiations over a period of time between Ferguson and Anderson; that Ferguson was aware what Anderson was making during these negotiations; and that Anderson had over 20 years experience in the home building industry and had been previously employed as a CFO.

70.     As the Tenth Circuit has so aptly stated:

"Title VII does not make unexplained differences in treatment per see illegal nor does it make inconsistent or irrational employment practices illegal.  It prohibits only intentional discrimination based upon an employee's protected class characteristics."

*Kendrick*, 220 F.3d 1232 (*quoting Flasher*, 986 F.2d at 1319) (emphasis deleted).  It's the Court's role to "prevent unlawful hiring practices, not to act as a super personnel department that second guesses employer's business judgments."  *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999), *cert. denied*, 428 U.S. 815.  Lewis has not demonstrated nor does the evidence support any finding that Horton's reasons are pretextual.

71.     Finally, Lewis' only evidence of gender-based animus is when Ferguson called her "Aunt Bea."[10]   Lewis testified in her deposition that Ferguson called her "Aunt Bea" on a regular basis which she considered condescending, belittling and sexist. Horton Exh. C, 367: 17-

---

[10]Such a statement is insufficient to state a claim for hostile work environment.  To establish a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998).

25, 368: 1-25; 369: 1-24.  This allegation is insufficient to make a showing that Horton's reasons

were unworthy of belief.

*Equal Pay Act Claim.*

       1.     Legal standard.

      72.     The Equal Pay Act provides, in relevant part:

> No employer...shall discriminate...between employees on the basis of sex by paying
> wages to employees...at a rate less than the rate at which he pays to employees of the
> opposite sex...for equal work on jobs the performance of which requires equal skill,
> effort, and responsibility, and which are performed under similar working conditions,
> except where such payment is made pursuant to (i) a seniority system; (ii) a merit
> system; (iii) a system which measures earnings by quantity or quality of production; or
> (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

As the Supreme Court summarized,

> Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to
> be a serious and endemic problem of employment discrimination in private industry the
> fact that the wage structure of 'many segments of American industry has been based on
> an ancient but outmoded belief that a man, because of his role in society, should be paid
> more than a woman even though his duties are the same.'  The solution adopted was
> quite simple in principle:  to require that 'equal work will be rewarded by equal wages.'

*Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (citation omitted).

      73.     "The Act's basic structure and operation are similarly straightforward." *Id.*  To

establish a *prima facie* case under the EPA, the plaintiff has the burden of proving that (1) she was

performing work which was substantially equal to that of the male employees considering the skills,

duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was

performed were basically the same; and (3) the male employees were paid more under such

circumstances.  *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993) (citations

omitted).  Under the EPA, the term "equal work" is construed narrowly, and a failure to furnish equal pay for "comparable work" or "like jobs" is not actionable. *Id.*

> 2.     Discussion.

74.     In order to survive summary judgment, Lewis must produce evidence creating a genuine issue of material fact showing that she performed work substantially equal in duties, skill, effort, and responsibility to the work performed by her comparator, Anderson.  The analysis under Title VII applies here as well. *Sprague*, 129 F.3d at 1364.  As previously noted, Anderson and Lewis were not similarly situated.  Nor do the facts create an issue of fact whether Lewis and Anderson were performing "equal work."

75.     Lewis relies on her affidavit that before Anderson was hired she "met with Mr. Ferguson daily to discuss and address not only financial, accounting, and planning issues, but also operational issues involving construction, marketing, land acquisition, and infrastructure." This is the only evidence in the record that Lewis was essentially performing the job of the CFO is her affidavit.  The Tenth Circuit has held that Plaintiff's affidavit alone, however, is insufficient to overcome Horton's evidence to the contrary. *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000) citing *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.1995) (conclusory, self-serving affidavit insufficient to withstand motion for summary judgment); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991) (same).

76.     Not only is Lewis' testimony contrary to Horton's evidence, it is contrary to the evidence submitted by Lewis.  Lewis submitted a exhibit entitled "Job Description" for the position of VP Accounting/Operations.  The "General Summary" section states:

> "Assure proper accounting for assets and liabilities.  Monitor adherence to company policies and goals.  Provide accurate and complete reporting to the division president, the regional

management and corporate entities.  Prepare monthly financial statements for corporate review."

Lewis Exh. 2.

In the many e-mails attached as exhibits, there is no mention by Lewis or Ferguson of operational issues of construction, marketing, land acquisition or infrastructure other than the information in the three reports, the Five-Year Budget projections, LAFS and Tract Pie.  After he was hired Anderson assumed these responsibilities; and Lewis was no longer responsible.

77.    Lewis also relies on the fact that she trained Anderson on some of the reporting processes.  As discussed previously, it is undisputed that Anderson took over the three reports.  The fact that she trained him to do these reports is not evidence that they performed "equal work."  Though there are similarities as to their positions, there are also vast differences.  Simply stated, the duties and responsibilities of a controller and a CFO at Horton were different. Equal pay is not required because of the different level of experience, the different level of responsibility and the difference in performance between Lewis and Anderson.  Thus, Lewis cannot establish a *prima facie* case.

78.    Moreover, Horton has borne its burden as a defense to this claim that it paid Anderson more than Lewis because of factors other than Lewis' gender.  The undisputed facts demonstrate that Anderson had more experience in the home building industry than Lewis and had performed CFO responsibilities for two homebuilders prior to his employment with Horton. *EEOC v. Central Kansas Medical Center*, 705 F.2d 1270, 1272 (10th Cir 1983) (rejected on other grounds, *McLaughlin v. Richland Shoe Co*., 486 U.S. 128 (1988)) ("'Skill' includes such considerations as experience, training, and abilities."). In addition Anderson was being paid $123,000 plus bonus by his previous employer.  The undisputed facts are that Anderson's pay was based on negotiations

31

between Anderson and Ferguson.  There is no evidence that Lewis' compensation was material to these negotiations.

**Conclusion**.

79.     Based on the totality of the evidence and making all inferences in Lewis' favor, as is required, the Court is convinced that there are no genuine issues of material fact as to whether Horton intentionally discriminated against Lewis on the basis of her gender.  Lewis has not shown that Horton's justifications for hiring a CFO and changing her work duties and responsibilities were so plagued by "weaknesses, implausibilities, incoherencies, or contradictions" as to be unworthy of credence.  *Morgan v. Hilti, Inc.*, 108 F.3d at 1323.  There is no genuine issues of material fact as to whether Anderson and Lewis were performing equal work or Horton's reasons for Anderson's salary.

**Motion to Strike**.

80.     In her Response, Lewis asks the Court to strike the Third Affidavit of Mark Ferguson. Lewis argues that the Affidavit conflicts with Ferguson's deposition testimony and Horton's business records and thus Ferguson lacks credibility.  Lewis also asserts that the Affidavit contains inadmissible testimony.  However, Lewis fails to point out the conflicts or inadmissible evidence in the Affidavit.   As a matter of fact, Lewis' Response states that she does not dispute many of the facts asserted in the Affidavit.

81.     A court has the discretion to strike sham affidavits submitted pursuant to Fed.R. Civ.P. 56(g).  However, an affidavit in support of a summary judgment memorandum "is not automatically disregarded" because it conflicts with the affiant's prior deposition testimony. *Durtsche v. American Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992).  A conflicting affidavit

can be disregarded if the court first determines that the affidavit is "simply an attempt to create a 'sham fact issue.'"  *Id.*

82.     Lewis does not argue with any specificity that this is a sham affidavit and the Court is not persuaded that it is.  The Court relied on only undisputed facts in the Affidavit and construed all facts in favor of Lewis in its analysis and thus, will deny this Motion.

### **RECOMMENDED DISPOSITION**.

83.     The Court recommends that Defendant D.R. Horton Inc.,'s Motion for Summary Judgment No. 1:  Motion for Summary Judgment on Liability with Respect to all Claims filed December 14, 2007, be granted and Plaintiff's Complaint for Sex Discrimination and all her claims therein be dismissed with prejudice.

**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE**